**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
DARLENE F. HOMERE and
GERALD JEAN-BAPTISTE,

                              *Pro se* Plaintiffs,

                                                              **REPORT AND**
                                                              **RECOMMENDATION**

              -against-
                                                              CV 17-3173 (JFB) (AKT)


INC. VILLAGE OF HEMPSTEAD and
STEPHANIE VALDER,

                              Defendants.
-----------------------------------------------------------X

**A. KATHLEEN TOMLINSON, Magistrate Judge:**

I.      P**RELIMINARY** S**TATEMENT**

        This matter is back before this Court for a Report and Recommendation as to whether the

Second Amended Complaint filed by *pro se* Plaintiffs Darlene F. Homere and Gerald Jean

Baptiste ("Plaintiffs") should be dismissed.  In their previous Amended Complaint,[1] Plaintiffs

alleged that Defendants the Incorporated Village of Hempstead (the "Village") and Stephanie

Valder ("Valder") (collectively, "Defendants") perpetrated a plot to deprive them of their

residential property.  The Court construed the Amended Complaint to assert claims for, among

other things, malicious prosecution, fraud, abuse of process, and conspiracy.  *See generally*

Plaintiffs' Amended Complaint ("Am. Compl.") [DE 18].  When the Defendants previously

moved to dismiss the Amended Complaint, Judge Bianco referred the motions to this Court for a

Report and Recommendation as to whether these motions should be granted.  *See* October 18,

2017 Electronic Order.  In the  February 1, 2018 Report and Recommendation, this Court

---

[1]   Plaintiffs filed an initial Amended Complaint on July 7, 2017.  *See* DE 18.

recommended to Judge Bianco that both motions to dismiss be granted and that Plaintiffs'
Amended Complaint be dismissed. *See* Report and Recommendation of February 1, 2018
("February 1, 2018 R&R") [DE 30]. On March 22, 2018, Judge Bianco adopted the Report and
Recommendation in its entirety, over Plaintiffs' objections, and granted Plaintiffs leave to file a
second amended complaint within 45 days. *See generally* March 22, 2018 Order Adopting
Report and Recommendations [DE 38]. The 45-day filing deadline was extended to May 17,
2018. *See* DE 40.

On May 17, 2018, Plaintiffs filed a 68-page "Second Amended Complaint" naming the
same defendants as were named in the Amended Complaint. *See generally* Second Amended
Complaint ("SAC") [DE 41]. A revised SAC was filed on May 18, 2018 which added
"Mr. Levy" as a defendant. [2] *See* DE 42-1. Both the Village and Valder have moved to dismiss

---

[2]    On May 18, 2018, one day after Plaintiffs filed the Second Amended Complaint,
Plaintiffs filed a handwritten letter, stating, among other things, that they were "resubmitting the
complaint today 5-18-2018 because the caption was not updated to include Mr. Levy." DE 42.
The revised Second Amended Complaint was attached to the letter. *See* DE 42-1. As far as the
Court can tell, the May 18, 2018 pleading is identical to the May 17, 2018 pleading but for the
addition of "Mr. Levy" as a defendant. The Court points out that the Village takes the position
that Plaintiffs filed two amended complaints and that the document filed a day late [DE 42-1] is
not properly before the Court. *See* Village's Mem. at 6. Counsel for the Village goes on to state
"[h]owever, [ ] the only difference between the two second amended complaints is that in the
latter second complaint Plaintiffs added 'Mr. Levy' to the caption. Thus, the undersigned will
address the meritless [*sic*] of both second amended complaints." *Id*. at 6. It is also worth noting
that counsel for Defendant Stephanie Valder included as an exhibit to Valder's motion papers the
Second Amended Complaint filed on May 18, 2018 [DE 42-1] and not the pleading filed on
May 17, 2018. *See* Declaration of Jeffrey V. Basso, Esq., in Support of Defendant Valder's
Motion to Dismiss ("Basso Decl.") [DE 46-1], attached to Valder's Motion to Dismiss Plaintiffs'
Second Amended Complaint ("Valder's Mot.") [DE 46]. It is also important to point out an
inadvertent error in Defendant Valder's Memorandum of Law. Specifically, counsel asserts that
the Second Amended Complaint should be "stricken as untimely because it was filed ten (10)
days after the Court's deadline." Valder's Mem. at 2. However, the correct deadline was *May
17* as reflected in Judge Bianco's actual Order of April 27, 2018 [DE 40]. Unfortunately, the
electronic entry on the docket sheet erroneously refers to the deadline as "May 7, 2018."
Plaintiffs' May 17, 2018 filing was therefore timely. Counsel for Valder does not address the
May 18, 2018 filing at all and proceeds with the argument seeking to have the May 17 filing

the SAC.  *See generally* Village's Memorandum in Support of its Motion to Dismiss ("Village's Mem.") [DE 43-6]; Village's Memorandum in Reply ("Village's Reply") [DE 50]; Valder's Memorandum in Support of her Motion to Dismiss ("Valder's Mem.") [DE 46-11]; Valder's Memorandum in Reply ("Valder's Reply") [DE 51].  Plaintiffs oppose both motions.  *See generally* Plaintiffs' Memorandum in Opposition to the Village's Motion ("Pls.' Opp'n. I") [DE 48]; Plaintiffs' Opposition to Valder's Motion ("Pls.' Opp'n. II") [DE 49].  On October 10, 2018, Judge Bianco referred both motions to dismiss to this Court for a Report and Recommendation as to whether the motions should be granted.  *See* DE 54.

Several weeks after the motions to dismiss were referred to this Court, Plaintiffs filed a letter motion requesting that they be permitted to amend their pleadings "to add another party, Jeffery Falk as a defendant in the caption."  Plaintiffs' Motion to Amend the SAC ("Pls.' MTA") [DE 55].  The Village has filed a short opposition to this motion.  *See* Village's Opposition to Plaintiffs' Motion to Amend the SAC ("Village's Opp'n. to MTA") [DE 57].  Judge Bianco has referred Plaintiffs' motion to amend the SAC to the undersigned for a Report and Recommendation as to whether the motion should be granted.  *See* DE 56.

For the reasons set forth below, the Court respectfully recommends to Judge Bianco that both Defendants' motions to dismiss the SAC be GRANTED, and that Plaintiffs' motion to further amend the SAC be DENIED.

---

dismissed.  Because there is no prejudice to either the Village or Valder, the Court, in its discretion, accepts the one-day late submission filed at DE 42-1 and the Court's decision here encompasses both DE 41 and DE 42-1.

## II.    BACKGROUND

### A.    Facts Alleged in the Second Amended Complaint[3]

The following allegations have been taken from the SAC.  All facts alleged by Plaintiffs

are assumed to be true for purposes of deciding the motions to dismiss and are construed in the

light most favorable to the Plaintiffs as the non-moving parties.  *See, e.g.*, *LaFaro v. N.Y.*

*Cardiothoracic Grp.*, 570 F.3d 471, 475 (2d Cir. 2009); *Matthews v. City of N.Y.*, 889 F. Supp.

2d 418, 425 (E.D.N.Y. 2012).  Importantly, *pro se* filings such as Plaintiffs' Amended Complaint

are to be liberally construed.  *Shin v. Queens Hosp. Ctr. in Jamaica*, No. 14-CV-7237, 2014 WL

7422664, at *3 (E.D.N.Y. Dec. 31, 2014).  "[A] *pro se* complaint, however inartfully pleaded,

must be held to less stringent standards than formal pleadings drafted by lawyers."  *Kneitel v.*

*Silvery*, No. 15-CV-6811, 2018 WL 526486, at *2 (E.D.N.Y. Jan. 22, 2018) (quoting *Erickson v.*

*Pardus*, 551 U.S. 89, 94 (2007)).  Accordingly, "the submissions of a pro se litigant must be . . .

interpreted to raise the strongest arguments that they suggest."  *Triestman v. Fed. Bureau of*

*Prisons*, 470 F.3d 471, 474 (2d Cir. 2006) (internal quotation marks omitted); *McPherson v.*

*Coombe*, 174 F.3d 276, 280 (2d Cir. 1999).

Plaintiffs' SAC is, like their previously filed Amended Complaint, difficult to follow,

both in its chronology and its substance.  However, the SAC appears to allege the same general

narrative as their previous pleading, namely, the existence of a conspiracy between Village

officials and one or more of Plaintiffs' tenants, among others, to harass and prosecute Plaintiffs

for violations of the Village building code and with the ultimate goal of dispossessing them of

their residential property.  Indeed, many portions of Plaintiffs' SAC appear to be taken verbatim

---

[3]   Because the allegations in the SAC are not organized in consecutively numbered
paragraphs, or numbered paragraphs generally, the Court's citations to the SAC are made by
page number.

from the previously dismissed Amended Complaint.  Ordinarily, the Court would attempt to perform a side-by-side analysis of the Amended Complaint and the SAC to determine where Plaintiffs' new allegations, if any, are raised in the SAC.  Such an analysis is not feasible here because the SAC is organized in a completely different manner from the Amended Complaint. The Court will therefore recount the allegations in the SAC in their entirety.

### 1.    *Allegations against the Village*

#### a.    **Overview**

Plaintiffs allege that in 2008, they came under "a constant barrage of harassment by a housing inspector George Foster with the acquiescence of his superior Assistant Superintendent Joseph Simone.  They colluded with a Section 8 tenant (Janice Henderson) to create violations for [Plaintiffs] to be charged with."  SAC at 2-3.  This alleged harassment continued "until December 2009 when Plaintiffs' grievances were shared with the Mayor, Wayne Hall, and his Deputy Henry Conyers."  *Id*. at 3.  Plaintiffs assert that as a result, on January 27, 2010, "close to fifty violations were dismissed by Matthew Fienberg – the special prosecutor for the village of Hempstead."  *Id*.  Plaintiffs allege, however, that "in October 2013, [they] were brought back to Court to address the same charges that were dismissed by the special prosecutor on January 27, 2010."  *Id*.  According to the SAC, these charges were again dismissed in April 2014, and "[t]he dismissal was verbally communicated to [Plaintiffs] by a representative of the prosecutor's office to [Plaintiffs'] attorney Brian Davis."  *Id*.  Despite being told they would get confirmation of this dismissal from the court via mail, Plaintiffs appear to allege they never received this confirmation, stating that "there was no follow thru [*sic*]."  *Id*.

According to the SAC, the unwarranted prosecutions of Plaintiffs originated from allegations raised by Section 8 tenants residing at Plaintiffs' properties.  SAC at 5.  Plaintiffs

state that "[t]he most outstanding proof that all building violations charges brought against [them] are fraudulent is that none were reported to Section 8. . . . [V]iolations went unreported to Section 8 because there were never any violations to report." *Id*. at 6. Plaintiffs assert that these violations either lack evidentiary support – they claim Inspector George Foster signed a document describing violations that he supposedly observed at a time and place where he was not present – or the circumstances underlying them were created by the vandalism of the tenants themselves. *Id*.

Through the course of their prosecutions, Plaintiffs allege that "disturbing allegations" surfaced confirming the existence of a "vendetta" to take Plaintiffs' property. SAC at 4. Specifically, Plaintiffs aver that (1) the Village denied having dismissed previous charges on January 27, 2010; (2) Plaintiffs' appearance in court on January 27, 2010 "was before a judge who had set March 3, 2010 as a trial date," and (3) the Village obtained a warrant on March 3, 2010 for Plaintiffs' arrest because they did not appear in court on that date. *Id*. According to the SAC, "a fabricated transcript was released" to Plaintiffs' attorney Elliot Bloom in December 2014 – although it is not clear from what proceeding the transcript emanated – and other "[d]ocuments were fabricated to prosecute" Plaintiffs for the same charges that were dismissed on January 27, 2010. *Id.*

Like their previous pleading, Plaintiffs allege that "[t]hese events did not occur in a vacuum. They were part of a broader scheme to keep [Plaintiffs] distracted and preoccupied in order to facilitate the complete takeover of [their] property by Mr. Levy, an official in the Treasurer's Office in the Village." SAC at 4-5. According to Plaintiffs, Mr. Levy informed them in 2010 that the property at 196 Long Beach Road "does now belong to him." *Id*. at 5. The "takeover" of Plaintiffs' property was allegedly effected by the manipulation and alteration of

tax records for the purpose of keeping a tax lien hidden "so as to prevent [Plaintiffs] from receiving a 'Notice to Redeem.'" *Id*. "That [manipulation and alteration] was easily accomplished by simply logging on, enter[ing] a password and a few keystrokes—no need for hacking a system that one is allowed to operate." *Id*. Plaintiffs allege that tax records indicate that in 2008, when they were being "prosecuted and persecuted as the owner[s] of the premises, Mr. Levy was the owner of record" of Plaintiffs' property at 196 Long Beach Road. *Id*. According to the SAC, Mr. Levy "brought in Mr. Simone and Mr. Foster to create the conditions to have the property free of tenants through harsh harassment."[4] *Id*.

### b.    First Round of Prosecution[5]

As to their specific prosecutions by the Village, Plaintiffs state that in 2008 they were prosecuted "on behalf of Janice Henderson, a Section 8 tenant residing at 196 Long Beach Road, Hempstead, New York 11550 for code violations." SAC at 6. Plaintiffs received a notice of violation from Inspector George Foster dated September 11, 2008. *Id*. These charges were dismissed on January 27, 2010.[6] *Id*.

---

[4]  Plaintiffs go on to state that this was "a Machiavellian maneuver that would have raised Bernie Madoff's eyebrows. A prosecution that started as a smokescreen to provide Mr. Levy with the latitude to distract us while taking over our property was restarted four years later in the same court with the same charges. This is astonishing!" SAC at 5. The SAC is full of similar superfluous and often conspiratorial assertions.

[5]  Several of the facts alleged in the SAC occurred many years prior to the filing of the initial Complaint in this action. The Court addresses the relevant statute of limitations in its analysis.

[6]  In a subsequent portion of the SAC, Plaintiffs state as follows: "On October 27, 2010, when the charges were dismissed by Prosecutor Feinberg, for the property at 196 Long Beach Road, it was at the direction of Arthur Chenault, the Superintendent of the Building Department, whom the Mayor had instructed to ascertain the validity of the charges." SAC at 7. The Court assumes the reference to "October 27, 2010" is an error, and the correct date is January 27, 2010.

Plaintiffs make a number of assertions about their relationship with Janice Henderson. They claim she was a difficult tenant, filing two impliedly frivolous slip-and-fall lawsuits while living at 196 Long Beach Road.  SAC at 8.  In 2008, Allstate, their insurer, informed them that it had settled with Henderson for $17,000.00.  *Id*.  Plaintiffs state that they attempted to evict Janice Henderson in July 2008, and on September 11, 2008 they received a notice of violations from George Foster.  *Id*.  On August 21, 2008, a friend of the Plaintiffs overheard a conversation between Henderson and another person in which Henderson stated that she "was visited by an attorney from the [t]he Village who had promised her help with her lawsuit against Plaintiffs. He also promised to give her a good deal when transferring the property to her, when she gets her money from the lawsuit."  *Id*. at 8-9.  Plaintiffs assert that Inspector George Foster "was instrumental in Janice Henderson's alleged slip and fall case against [them] in 2001 and 2002," *id*. at 9; however, it is not clear to what lawsuits Plaintiffs are referring here.  They further state that in approximately 2009, a deposition was conducted "in her lawsuit" – again it is not clear to which lawsuit Plaintiffs refer here – and "most of the questions from [Henderson's] lawyer Leo Trekiel were from documents provided by George Foster."  *Id*.  According to the SAC, when Henderson moved out "at the end of 2008, Plaintiffs had to deal with a loss of $6,153.00 for back rent and around twenty-five thousand ($25,000.00) in utility (gas), nineteen thousand ($19,000.00) still outstanding in Plaintiffs' name."  *Id*.

The SAC asserts that in 2009, after Henderson left 196 Long Beach Road, a different tenant at that property was approached by George Foster, who "wondered why she was there and [stated] that she should not be there.  He proceeded to tell her that he was closing the house down and that this landlord beside being a slumlord was also a sexual predator."  SAC at 9-10. Plaintiffs state that after this incident, they went to the police regarding their problems with

Foster. *Id*. at 10. Shortly thereafter, Plaintiffs state that a "Mr. Simone" visited them – it is not clear who Mr. Simone is, although it appears he works for the Building Department. Simone gave them his card, and stated the following: "I understand that you have some issues with one of my inspectors – I know you went to the police – If you don't stop that sh . . . you and your family are going to live to regret it." *Id*. Plaintiffs aver that in the weeks which followed, they received "[c]lose to fifty citations" from Foster and were "making weekly appearances in Court." *Id*.

### c.   Second Round of Prosecution

Plaintiffs assert that in October 2013, the Village started a second "round" of prosecution "on behalf of Tiffany Carter, a Section 8 tenant residing at 35 Elizabeth Avenue, Hempstead, New York." SAC at 6. Tiffany Carter allegedly "create[d] violations for [Plaintiffs] to be charged with" relating to "35 Elizabeth Avenue, 2nd Floor."[7] *Id*. at 11; *id* at 13. As to the Village's motivation for this second round of prosecution, the SAC asserts that "[i]n November of 2013, realizing they were exposed because [Plaintiffs] had retained an attorney . . . [the Village] engaged in a new round of harassment as a means to gain leverage. It started in identical fashion as the previous round and lasted until early 2017." *Id*. at 11. "Inspector Tesoriero who recorded these violations (no smoke detectors, no carbon monoxide, no railing on the stairs, hole in the glass on the entry door, mice droppings) told [Plaintiffs] after learning [Tiffany Carter] was a Section 8 tenant that he was not going to bring any charges." *Id*. Plaintiffs state that, notwithstanding this representation, charges were filed against them. *Id*.

---

[7]   This reference to "35 Elizabeth Avenue, 2nd Floor" appears in the excerpt of Plaintiffs' motion to dismiss the Village Court proceeding which is included on pages 13-15 of the SAC.

As to these charges, Plaintiffs met with the Village Prosecutor on February 26, 2014, who, after reviewing the evidence, "informed Plaintiffs that there was no case [ ] and [that she would] confer with her boss for a dismissal." SAC at 13. This did not happen, and late in 2014, Plaintiffs filed a motion to dismiss "on the basis of speedy trial violation rule." *Id*. Their motion to dismiss also contended that the conditions underlying the violations were created by the tenant herself. *See id*. at 13-15.[8] Plaintiffs state that "month after month after month" their case was adjourned. *Id*. In response to Plaintiffs' motion to dismiss the Village Court proceeding, the SAC asserts "Mr. Feinberg stated that an adjournment in July of 2014 was requested" by Plaintiffs to complete repairs of their property. *Id*. at 12. However, Plaintiffs claim that "[t]his was a bold lie since the building was vacant and boarded up since April 1, 2014, due to a fire on the first (1st) floor and the Court was informed of such. Had the fire started in the dead of night, the tenants on the second floor the very one that created these violations would have faced tragedy with no smoke detectors and no railings on the stairs. Who would be to blame?" *Id*. It is not clear from the SAC how the Village Court disposed of Plaintiffs' motion to dismiss.

The SAC contends that several other events demonstrate the Village's intent to unlawfully prosecute Plaintiffs between 2013 and 2017. In the fall of 2013, according to Plaintiffs, Inspector Carlos Duran was told to issue a ticket at Plaintiffs' property located at 11 Oak Avenue in Hempstead, because an SUV was parked partially on the grass. SAC at 19. On March 18, 2014, "according to Nikki Thomas's daughter" – it is not clear who Nikki Thomas or her daughter are, although the Court assumes they are Plaintiffs' tenants – two Hempstead Village Inspectors knocked on her door and inquired as to whether her mother had any

---

[8]  Plaintiffs' SAC purports to quote verbatim multiple filings from the underlying Village Court case at pages 13-19.

complaints to make. *Id*. On March 3, 2015, "garbage pick-up at 196 Long Beach Road was not done," although the rest of the block's garbage was picked up. *Id*. at 20. On March 6, 2015, "Kevin Jackson was in front of [Plaintiffs'] residence at 11 Oak Avenue, in Hempstead at 10:45 a.m." – it is not clear who Kevin Jackson is, although the Court assumes he works for the Building Department – and told Plaintiffs that snow on their walkway was not sufficiently removed. *Id*. And on June 16, 2015, "Kevin Jackson was at the property on 196 Long Beach Road in Hempstead, trying to get inside the second-floor apartment. He was demanding access to the basement and had with him a police officer."[9] *Id*. Additionally, Plaintiffs assert that in March 2017, a tax bill associated with one of their properties was "inflated by twenty-five percent (25%)." *Id*. After Plaintiffs complained, the Village "claimed an error." *Id*.

### d.    Other Prosecution-Related Allegations

There are many allegations it the SAC that are unconnected to any specific date or time period, or which require pulling together allegations from different places in the SAC based on context. For example, under a heading that reads "TRIAL," the SAC discusses Plaintiffs' trial for alleged violations at 35 Elizabeth Avenue and 196 Long Beach Road. *See* SAC at 22. In a different section of the SAC, Plaintiffs assert that "[o]n January 3, 2017, a decision was handed down by Judge [Ayesha] Brantley,[10] finding liability for Plaintiffs on two (2) of five (5) charges." *Id*. at 6-7. Plaintiffs aver that included in this decision "is [Justice Brantley's] finding in conjunction with another property (196 Long Beach Road) that was recently reacquired by

---

[9]   Plaintiffs contend that the tenant whose apartment Kevin Jackson was allegedly trying to enter, "Willie Sean White[,] . . . casted doubt on" on the veracity of Mr. Jackson's testimony related to these events.   SAC at 21.

[10]   References to "Judge" or "Justice" Ayesha Brantley identify Hempstead Village Court Justice Ayesha Brantley.

Plaintiffs.  She found liability for Plaintiffs on three (3) of eight (8) items listed." *Id*. at 7. Although it is not by any means clear, the Court assumes that these sets of allegations concern the same judicial disposition.

As to this judicial proceeding, Plaintiffs state that they "had no idea of any alleged violations at 196 Long Beach road.  Plaintiffs never received proper notice of the alleged violations and as such" they claim their due process rights were violated accordingly.  *Id*.  SAC at 22.  Similarly, they assert that because they were not aware of alleged violations, "Plaintiffs had no witness and/or evidence to present at trial."  *Id*.  Plaintiffs contend that their trial for alleged violations at 35 Elizabeth Avenue was "not legitimate" because Judge Ayesha Brantley would not authorize subpoenas for Robert Sanford, "the head of Section 8 Inspectors," and Stephanie Valder, the court stenographer and defendant in the instant case.  *Id*. at 23.  According to the SAC, on April 7, 2015, Judge Ayesha Brantley "produced and released a legal document (transcript)," and on January 3, 2017, she "produced and released a legal document (decision)," stemming from Plaintiffs' prosecution for violations at 35 Elizabeth Avenue and 196 Long Beach Road.  *Id*. at 24.  Plaintiffs assert that "[b]oth documents are deceitful and their primary purpose is to deceive the judicial system."  *Id*.  They also claim that "by combining the two trials into one decision [Brantley] astutely created the impression of being fair and balance while achieving her goal of removing one leg of a malicious prosecution claim."  *Id*.  Although it is less than clear, Plaintiffs appear to assert that combining the prosecutions for the two separate properties into a single proceeding was intended to hide the fact that "there was no probable cause for the Prosecution on Elizabeth Avenue."  *Id*. at 26.

Under a heading in the SAC which reads "CONSPIRACY," Plaintiffs assert that they requested the audio recording of an "imaginary" court session that they claim did not take place.

SAC at 26.  The Village Court responded that the recording was "not available."  *Id*.  According to the SAC, the fact that the court stated this recording was "not available," rather than stating that the recording "does not exist," is evidence of "the Court in the person of Ayesha K. Brantley [ ] being deliberately ambiguous" and thereby "confirming her involvement in this illicit scheme."  *Id*.  Somewhat confusingly, the SAC alleges that Justice Brantley "created the document referred to as transcript," and in doing this "was giving cover to the prosecutor (Mr. Feinberg) that fabricated records to validate [Plaintiffs'] prosecution."  *Id*. at 27.  Plaintiffs go on to allege that "[t]o protect this cover, the Village Attorney and Ms. Brantley the Village Justice coordinated their activities to keep us tied up in Court.  To that end, they colluded with Tiffany Carter."  *Id*.

Under a heading in the SAC which reads "FRAUD," Plaintiffs assert that Janice Henderson and George Foster colluded together to harm Plaintiffs.  Specifically, Plaintiffs assert that Janice Henderson was promised help with her two slip-and-fall lawsuits by George Foster "in exchange for creating violations."  SAC at 27.  Similarly, Plaintiffs contend that almost every individual identified in the SAC committed some fraudulent act:  "Ayesha Brantley and [the] Village Attorney" "[c]reat[ed] a legal document that is meant to deceive;" "Mr. Levy" "[m]anipulat[ed] and alter[ed] tax records in order to convert $2,710.00 into a $434,500.00 windfall;" "Stephanie Valder" "[c]ertif[ied] a fake document knowing it is fake;" "Mr. Simone and George Foster" "[h]arass[ed] . . . individuals in order for them to be defrauded;" and "Mr. Feinberg" "[c]reat[ed] scenarios and fabricating records to cause individuals to be prosecuted." *Id*. at 28.

Under a heading in the SAC which reads "MALICIOUS PROSECUTION," Plaintiffs assert that their "[p]roseuction started even though the inspector assigned to the case was of the

opinion that there was no offense committed and when Ms. Ayesha Brantley . . . did not recuse herself from the case after having released a fake document to harm us." SAC at 29. Plaintiffs complain that they were "constantly harassed" by being forced to sit in court for hours "each time to only be told that [their] case ha[d] been rescheduled for two weeks later – this harassment has been ongoing from 2008-2010 and from 2013-2017." *Id*. They state that through this situation, they "experienced the feeling of being 'seized'— not being in control of [their] time and being imposed on." *Id*.

In what appears to be an attempt to impute liability to the Village for perceived constitutional violations, the SAC contains a heading "VILLAGE COURT PRACTICE and CUSTOM," under which Plaintiffs assert that "[i]t is common knowledge that the Village Court in Hempstead has a practice of operating in an arbitrary and capricious manner." SAC at 30. They also argue that "[t]he three main movers (Judge Brantley, Village Attorney DiSalvo, and Special Prosecutor Feinberg) of the Village of Hempstead have collaborated" and "undermined the integrity of the Court system in Hempstead. On the basis of their long, combined tenure and experience of over 50 years as Village Officials, charged with the responsibility to protect the rights of the community, one can reasonably infer that Plaintiffs' case is not isolated but part of an ongoing criminal practice." *Id*. at 29. Under this heading, Plaintiffs claim that they suffered certain indignities at the hands of the Village in 1988, 1990, and 1998, including zoning issues and allegedly manufactured violations of the building code. *Id*. at 31-32.

### e.     Tax-Lien Taking of Plaintiffs' Property

Although Plaintiffs state they paid off their mortgage on 196 Long Beach Road in 2005, the SAC asserts "[a] snafu by the Title Company left the second half of 2005 taxes for the Village open. That lien was hidden from Plaintiffs." SAC at 37. According to records they

14

examined, Plaintiffs state that their "address was fraudulently changed to a previous address in 2008-09 to prevent Plaintiffs from receiving a Notice to Redeem." *Id*. The SAC alleges that this "scheme was very simple," with Plaintiffs' address being changed to 11 Oak Road and the Village allowing a tax-lien to be placed on Plaintiffs' property. *Id*. at 38. Plaintiffs hypothesize that because 11 Oak Road is where their tenant Janice Henderson has resided since 2001, Henderson was colluding with the Village in some capacity "in keeping Plaintiffs in the dark." It is not clear from the SAC to what extent Plaintiffs' property has actually been taken by the Village.[11]

### 2. *Allegations Against Valder*

Similar to Plaintiffs' previous pleading, the SAC contains allegations against Stephanie Valder, a courtroom stenographer. According to the SAC, Valder was involved in a scheme with Village officials and Plaintiffs' tenants, carrying out her role by "certifying a transcript of a Court session that never took place." SAC at 33. The purported evidence of Valder's involvement in this scheme exists, according to Plaintiffs, in the fact that Valder produced a transcript of a proceeding occurring on a date and time when Plaintiffs were not in the Village Courtroom. *Id*. This portion of the SAC is full of Plaintiffs' speculations as to why Valder would fraudulently certify a transcript, with Plaintiffs concluding that "one can infer that from the outset she knew she was doing a favor to the Justice Court who has helped with work before to the detriment of a defendant she does not know." *Id*. at 35. At the same time, Plaintiffs assert that "the production of the transcript was a team effort that included Brantley, DeSalvo, Venant, Valdor, and Feinberg." *Id*. at 36.

---

[11]  Plaintiffs' opposition to the Village's motion states that "a manipulation of tax records and an array of misconducts by Village officials, led to Plaintiffs losing their property at 196 Long Beach Road." Pls.' Opp'n. I at 7.

### B.    Relevant Procedural History

Plaintiffs filed the initial Complaint in this action on May 25, 2017.  *See* DE 1.  On

June 20, 2017, Plaintiffs filed a motion to amend their Complaint, *see* DE 13, which was granted

by Judge Bianco.[12]  *See* DE 21.  Plaintiffs filed their Amended Complaint on July 7, 2017.  *See*

DE 18.  On August 14, 2017, the Village filed its motion to dismiss Plaintiffs' Amended

Complaint pursuant to Fed. R. Civ. P. 12(b)(6).  *See* DE 22.  Several days later, on August 18,

2017, counsel for Defendant Valder filed a Rule 12(b)(6) motion to dismiss.  *See* DE 23.  On

October 18, 2017, Judge Bianco referred both motions to dismiss to this Court for a Report and

Recommendation as to whether they should be granted.  *See* October 18, 2017 Electronic Order.

In a Report and Recommendation dated February 1, 2018, this Court recommended to Judge

Bianco that both motions to dismiss be granted and that Plaintiffs' Amended Complaint be

dismissed.  *See generally* February 1, 2018 R&R.  On March 22, 2018, Judge Bianco adopted the

Report and Recommendation in its entirety, over Plaintiffs' objections, and granted Plaintiffs

leave to amend their complaint a second time.  *See generally* March 22, 2018 Order Adopting

Report and Recommendations.

On May 17, 2018, Plaintiffs filed a 68-page "Second Amended Complaint"[13] naming the

same defendants as they named in the Amended Complaint.  *See generally* SAC.  Plaintiffs' filed

a revised SAC the following day on May 18, 2018, which added "Mr. Levy" is a defendant.  *See*

DE 42.  Both the Village and Valder have moved to dismiss the SAC.  *See generally* Village's

Mem.; Village's Reply; Valder's Mem; Valder's Reply.  On October 10, 2018, Judge Bianco

---

[12]    Judge Bianco granted the motion on July 18, 2017, after Plaintiffs had already filed their Amended Complaint.

[13]    While the document as filed is sixty-eight pages in length, only pages 1-41 contain allegations, and the remaining pages consist of attached documents.

referred both motions to dismiss the SAC to this Court for a Report and Recommendation as to whether the motions should be granted.  *See* DE 54.

### C.    The Motions to Dismiss

#### 1.  *The Village's Motion to Dismiss*

The Village moves to dismiss the SAC pursuant to Fed. R. Civ. P. 12(b)(6).  The Village argues that Plaintiffs have "failed to plausibly state the prerequisite conditions necessary to implicate municipal liability under Section 1983," in that they "do not plausibly allege any circumstances from which [to] establish the existence of a municipal policy, practice, or custom."  Village's Mem. at 6, 8.  To the extent Plaintiffs assert state law claims, the Village argues that such claims must be dismissed because no notice of claim was filed with the Village. *See id.* at 11.

#### 2.  *Valder's Motion to Dismiss*

Individual Defendant Stephanie Valder also moves to dismiss the SAC pursuant to Rule 12(b)(6).  Valder argues that:  (1) Plaintiffs do not allege any wrongful conduct by Valder or any basis for her individual liability; (2) Plaintiffs fail to allege specific facts demonstrating how Valder participated in any scheme or conspiracy allegedly perpetuated by the Village; (3) Plaintiffs do not allege that there was any improper relationship between Valder and the Village, other than the allegation that Valder "has an on-going relationship with the Judice Court (she has done work for us before) according to Deputy Clerk (Chris Venat)"; (4) Plaintiffs fail to plead with particularity how Valder committed fraud or made any false representation with intent to defraud Plaintiffs other than bare assertions that are not sufficient to state a cognizable claim; and (5) Plaintiffs fail to allege facts sufficient to demonstrate that Valder knowingly certified a

"fake" transcript or knowingly participated in any alleged scheme.  Valder's Mem. at 1-2; *see generally id.*

## III.    STANDARD OF REVIEW

In deciding a motion to dismiss pursuant to Rule 12(b)(6), the Court must liberally construe the claims set forth in the complaint, accept all factual allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff.  *See Aegis Ins. Servs., Inc. v. 7 World Trade Co., L.P.*, 737 F.3d 166, 176 (2d Cir. 2013) (quotations and citation omitted); *Grullon v. City of New Haven*, 720 F.3d 133, 139 (2d Cir. 2013).  The plaintiff must satisfy "a flexible 'plausibility standard.'" *Iqbal v. Hasty*, 490 F.3d 143, 157 (2d Cir. 2007), *rev'd on other grounds sub nom*. *Ashcroft v. Iqbal*, 556 U.S. 662 (2009).  "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 546 (2007).  The Court, therefore, does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570; *see Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC*, 595 F.3d 86, 91 (2d Cir. 2010) (holding that a complaint must set forth "a plausible set of facts sufficient 'to raise a right to relief above the speculative level'") (quoting *Twombly*, 550 U.S. at 555).  As noted above, the pleadings of *pro se* Plaintiffs are afforded a liberal construction, and read "to raise the strongest arguments that they suggest." *McPherson*, 174 F.3d at 280; *Shin*, 2014 WL 7422664, at *3; *Erickson*, 551 U.S. at 94.

The Supreme Court clarified the appropriate pleading standard in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), in which the Court set forth a two-pronged approach to be utilized in analyzing a motion to dismiss.  First, district courts are to "identify [ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* at 679; *see id.* at 678

18

("A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'") (quoting *Twombly*, 550 U.S. at 555)).  Though "legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." *Ashcroft*, 556 U.S. at 679.  Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Id*.  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.  The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id*. at 678 (citing *Twombly*, 550 U.S. at 556-57) (citations omitted).

In adjudicating a Rule 12(b)(6) motion, the Court must limit itself to facts alleged in the complaint, which are accepted as true; to documents attached to the complaint as exhibits or incorporated in the complaint by reference; to matters of which judicial notice may be taken; or to documents whose terms and effect are relied upon heavily in the complaint and, thus, are rendered "integral" to the complaint.  *See Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152-53 (2d Cir. 2002); *see also ASARCO LLC v. Goodwin*, 756 F.3d 191, 198 (2d Cir. 2014).  To the extent that Plaintiffs' memoranda in opposition to both motions include attachments that are not incorporated into the SAC by attachment or reference, the Court in its discretion declines to consider these documents in its analysis.  *See* DE 48, DE 49.  With respect to the documents attached to the SAC and incorporated in it, the Court exercises its discretion to consider these documents to the extent they bear upon the proper adjudication of the motions.  *See Chambers*, 282 F.3d at 152-53; *see also DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010)*.

## IV.    DISCUSSION

### A.    Claims Against the Village

Giving *pro se* Plaintiffs' pleading the liberal construction it is due, the Court determines

that Plaintiffs have attempted to plead the same claims in the SAC as they attempted to plead in

the Amended Complaint.  Specifically, as against the Village, the Court construes the SAC as

attempting to assert claims for (1) malicious prosecution; (2) malicious abuse of process; (3)

violations of double jeopardy; (4) violations of substantive due process; (5) conspiracy; and (6)

fraud.  *See generally* SAC.  Just as the Amended Complaint failed to explicitly reference 42

U.S.C. § 1983, so the SAC fails to reference this statute.  However, to the extent there is any

authority allowing Plaintiffs to bring this suit, and to the extent Plaintiffs attempt to plead

violations of their federal civil rights, it is Section 1983 which provides them a right of action.

*See Baker v. McCollan,* 443 U.S. 137, 144 n.3 (1979) (noting Section 1983 "is not itself a source

of substantive rights, but a method for vindicating federal rights elsewhere conferred by those

parts of the United States Constitution and federal statutes that it describes").  The Court will

therefore review Plaintiffs' SAC presuming that Plaintiffs bring their federal claims against the

Village pursuant to 42 U.S.C. § 1983.

In its previous Report and Recommendation to Judge Bianco recommending that the

Amended Complaint be dismissed, this Court addressed the threshold issue of *Younger*

abstention and whether that doctrine precluded the Court's exercise of jurisdiction over the

matter.  *See* February 1, 2018 R&R at 10-14.  The doctrine flowing from the Supreme Court's

decision in *Younger v. Harris*, 401 U.S. 37 (1971) "generally requires federal courts to abstain

from taking jurisdiction over federal constitutional claims that involve or call into question

ongoing state proceedings."  *Diamond "D" Const. Corp. v. McGowan*, 282 F.3d 191, 198 (2d

Cir. 2002) (citing *Younger*, 401 U.S. at 43-44).  A federal district court must decline exercising

jurisdiction when "(1) there is an ongoing state proceeding; (2) an important state interest is

implicated in that proceeding; and (3) the state proceeding affords the federal plaintiff an

adequate opportunity for judicial review of the federal constitutional claims." *Diamond "D"*

*Const. Corp.*, 282 F.3d at 198 (citing *Grieve v. Tamerin,* 269 F.3d 149, 152 (2d Cir. 2001)).

The Court will not repeat its analysis of whether *Younger* abstention applies here, but

comes to the same conclusion as it did in its previous Report and Recommendation.  Based on

the specific facts of this case, an exercise of abstention may be appropriate under *Younger*, but

only to the extent there exists a pending building code enforcement proceeding against Plaintiffs

in the Village Court, and only to the extent Plaintiffs seek injunctive relief in the instant federal

proceeding.  *See DeMartino v. New York State Dep't of Labor*, 167 F. Supp. 3d 342, 356

(E.D.N.Y. 2016) (noting that abstention is inappropriate where a plaintiff seeks money damages

for alleged constitutional violations pursuant to Section 1983), *aff'd in part, dismissed in part*,

16-978-CV, 2017 WL 4422515 (2d Cir. Oct. 5, 2017).  Because the Court remains unable to

conclude with certainty whether enforcement proceedings still exist against Plaintiffs in the

Village Court[14] – the SAC would appear to support the fact that there are no current enforcement

proceedings pending – and since "[a]bstention is a narrow exception to the generally broad duty

---

[14]    As the Court observed in its previous Report and Recommendation, if the Village Court proceedings have concluded with Plaintiffs losing, and if Plaintiffs' SAC is construed as a challenge to that outcome, the Court could potentially be precluded from exercising jurisdiction under the *Rooker-Feldman* doctrine.  The *Rooker-Feldman* doctrine stands for "the clear principle that federal district courts lack jurisdiction over suits that are, in substance, appeals from state-court judgments."  *Hoblock v. Albany County Bd. of Elections*, 422 F.3d 77, 84 (2d Cir. 2005).  Similarly, under the rule set out in *Heck v. Humphrey*, 512 U.S. 477 (1994), federal district courts are precluded from entertaining Section 1983 suits which challenge the validity of state court criminal convictions or sentences.  Given the inability of the Court to determine the nature and pendency of any Village Court proceedings against Plaintiffs, the Court declines to address these or similar doctrines of abstention or preclusion.

on the part of federal courts to exercise jurisdiction" and is therefore "the exception, not the rule," *Chittenden v. Connors*, 460 F. Supp. 2d 463, 468 (S.D.N.Y. 2006) (citing *Planned Parenthood of Dutchess-Ulster, Inc., v. Steinhaus,* 60 F.3d 122, 126 (2d Cir.1995)), the Court will proceed to evaluate the sufficiency of Plaintiffs' re-pleaded claims.

### 1.     *Municipal Liability Under Section 1983*

### a.     **Legal Standard**

Section 1983 imposes liability on, and creates a right of action against, anyone who, under color of state law, deprives a person "of any rights, privileges, or immunities secured by the Constitution and laws."  42 U.S.C. § 1983; *see Blessing v. Freestone*, 520 U.S. 329, 340 (1997).  To raise a successful claim under Section 1983, a plaintiff must sufficiently allege "that (1) the challenged conduct was attributable at least in part to a person who was acting under color of state law and (2) the conduct deprived the plaintiff of a right guaranteed under the Constitution" and laws of the United States.  *Kohutka v. Town of Hempstead*, 994 F. Supp. 2d 305, 316-17 (E.D.N.Y. 2014) (quoting *Snider v. Dylag*, 188 F.3d 51, 53 (2d Cir. 1999) (citation omitted)).

In order to state a Section 1983 claim against a municipality for violation of constitutional rights, "a plaintiff must assert that the alleged violations were committed pursuant to an official policy, practice or custom."  *Holland v. The City of New York*, No. 14 Civ. 5517, 2016 WL 3636249, at *9 (S.D.N.Y. June 24, 2016) (citing *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)); *see Feliciano v. Cty. of Suffolk*, 419 F. Supp. 2d 302, 312 (E.D.N.Y. 2005).  To successfully set forth such a claim, a plaintiff is required to plead three elements: "(1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."  *McLennon v. City of New York*, 171 F. Supp. 3d 69, 94 (E.D.N.Y. 2016)

(quoting *Torraco v. Port Auth. of N.Y. & N.J.*, 615 F.3d 129, 140 (2d Cir. 2010)); *see Simms v. City of N.Y.*, 480 Fed. App'x 627, 629 (2d Cir. 2012).  To establish the first element (*i.e.*, the existence of a policy or custom), a plaintiff may allege that one of the following exists:  "(1) a formal policy officially endorsed by the municipality; (2) actions taken by government officials responsible for establishing the municipal policies that caused the particular deprivation in question; (3) a practice so consistent and widespread that, although not expressly authorized, constitutes a custom or usage of which a supervising policy-maker must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees."  *Tieman v. City of Newburgh*, No. 13-CV-4178, 2015 WL 1379652, at *13 (S.D.N.Y. Mar. 26, 2015) (quoting *Brandon v. City of New York,* 705 F. Supp. 2d 261, 276-77 (S.D.N.Y. 2010) (citations omitted)).

"Although there is no heightened pleading requirement for complaints alleging municipal liability under § 1983, a complaint does not 'suffice if it tenders naked assertion[s] devoid of further factual enhancement.'"  *McLennon*, 171 F. Supp. 3d at 94 (quoting *Green v. City of Mount Vernon*, 96 F. Supp. 3d 263, 301-02 (S.D.N.Y. 2015) (citations omitted)).  Consequently, to survive a motion to dismiss a municipal liability claim, "a plaintiff must allege facts tending to support, at least circumstantially, an inference that . . . a municipal policy or custom exists."  *Santos v. New York City*, 847 F. Supp. 2d 573, 576 (S.D.N.Y. 2012) (citing *Dwares v. City of New York*, 985 F.2d 94, 100 (2d Cir. 1993)); *see Tieman*, 2015 WL 1379652, at *13 ("Mere allegations of a municipal custom, a practice of tolerating official misconduct, or inadequate training and/or supervision are insufficient to demonstrate the existence of such a custom unless supported by factual details.").

23

### b.    Application to the Second Amended Complaint

Even construing the allegations in the SAC "to raise the strongest arguments that they suggest," *McPherson* 174 F.3d at 280, the Court finds that Plaintiffs have again failed to plead facts sufficient to implicate municipal liability against the Village under Section 1983.  While the Court notes Plaintiffs' invocation of certain language associated with Section 1983 municipal liability, namely, "VILLAGE COURT PRACTICE and CUSTOM," SAC at 30; *see id*. at 31-32, for substantially the same reasons laid out in the Court's previous Report and Recommendation, Plaintiffs' SAC does not plausibly allege any of the circumstances from which a municipal policy, practice, or custom can be inferred

As noted above, for Section 1983 municipal liability to attach, Plaintiffs' allegations must sufficiently set forth a deprivation of a constitutional right based on the existence of at least one of four factors:  (1) a formal, officially endorsed policy; (2) actions taken by official municipal policymakers; (3) a widespread municipal practice so pervasive that supervising policymakers must have been aware; or (4) a failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.  *See Tieman*, 2015 WL 1379652 at *13 (citation omitted).  The essence of Plaintiffs' claims against the Village remains that its officials, in collusion with third parties, (including Plaintiffs' Section 8 tenants and a stenographer), concocted "a broad[ ] scheme to keep [Plaintiffs] distracted and preoccupied in order to facilitate the complete takeover of [their] property by Mr. Levy, an official in the Treasurer's Office in the Village."  SAC at 4-5.  Although in an attempt to support this theory, Plaintiffs have alleged multiple discrete acts by Village officials, they have failed to allege that any of this conduct constituted a formal, officially endorsed policy or practice of the Village.

Nor are Plaintiffs able to show that they suffered at the hands of official policymakers.  Indeed, as in Plaintiffs' previous pleading, the only official policymaker referenced in the SAC, Mayor Hall, purportedly *assisted* Plaintiffs.[15]  *See* SAC at 3.  Having failed to allege either an official policy or any action taken by an official policymaker, Plaintiffs' ability to allege the existence of a Village policy, practice, or custom necessary for Section 1983 municipal liability would necessarily depend on their ability to plausibly allege either (i) a widespread municipal practice or (ii) a failure by policymakers to provide adequate training or supervision.  Plaintiffs' SAC fails on both fronts.

In the Court's view, the allegations related to the "takeover" of Plaintiffs' property by way of a tax-lien do not plausibly suggest that there was a widespread practice in the Village of Hempstead of unlawfully dispossessing people of their property by changing their addresses so as to keep tax liens hidden.  Similarly, the SAC's allegations related to the two "rounds" of prosecution by the Village do not plausibly suggest that there was a widespread Village practice of maliciously prosecuting people for manufactured violations of the building code.

Nor do any of the SAC's allegations plausibly suggest a failure to provide adequate training or supervision in the context of either building code prosecutions or tax-liens.  Indeed, to the extent subordinate Village employees are accused of harming Plaintiffs, the SAC's allegations are focused almost exclusively on the malicious conduct of building inspectors –

---

[15]   Village judicial employees, including Village Justice Ayesha Brantley, are not policymakers for purposes of Section 1983 municipal liability.  *See Dellutri v. Vill. of Elmsford*, 895 F. Supp. 2d 555, 567 (S.D.N.Y. 2012) ("[M]ultiple district courts within the Second Circuit have determined that under New York law, village and similar judges are not considered village policymakers for the purposes of evaluating a *Monell* claim.").  Moreover, the allegations in the SAC are not nearly sufficient for the Court to determine whether any other Village employee is a "policymaker" for purposes of *Monell* liability.

specifically their lying and "manufacturing" of violations – rather than on allegations that these inspectors lacked sufficient training or supervision. *See, e.g.,* SAC at 6, 9, 19, 32.

At the end of the day, Plaintiffs' allegations in the SAC remain inherently conclusory and speculative in nature. As such, these allegations are insufficient to state a violation of Plaintiffs' constitutional rights either through a widespread practice or custom, or a failure to train or supervise. *See, e.g.*, SAC at 11 ("In November of 2013, realizing they were exposed because we had retained an attorney and that the charges would have to be dismissed, they engaged in a new round of harassment as a means to gain leverage."); *id*. at 19 ("Based on the fact that the case that the Prosecution embarked on was so weak and the Inspector (Tesoriero) assigned to it had given his word that there was no case, it was decided that another case was needed to be added in order to shore up the instant case in order to project some appearance of legitimacy to the prosecution."); *id*. at 21 ("Obviously, Kevin Jackson was under pressure by his superiors to find violations . . . ."); *id*. ("[B]ringing a police officer to intimidate tenants into providing access is contrary to the rules. What motivation for a rookie inspector to break the rules when they are not operating under a quota system?"); *id*. ("On March of 2017, one of our property tax bills were inflated by twenty-five percent (25%). After we protested, they claimed an error. Why us?"); *id*. at 24 ("By combining the two trials into one decision [Justice Brantley] astutely created the impression of being fair and balance[d] while achieving her goal of removing one leg of a malicious prosecution claim.").

Plaintiffs' memorandum in opposition to the Village's motion provides little to bolster their position. Rather, their opposition simply states their "belief" that the allegations in the SAC are sufficient to satisfy the prerequisites for municipal liability. To the extent Plaintiffs make specific arguments, their arguments are just as conclusory and speculative as the allegations in

the SAC, and in certain cases are simply the SAC's assertions restated verbatim.  For example, the following passage appears in both Plaintiffs' SAC and their opposition to the Village's motion:

> Plaintiffs' complaint lists multiple egregious and outrageous acts by Village of Hempstead Officials.  These acts certainly have caused harm to Plaintiffs and Plaintiffs' interest.  Consequently, it is clear that relief should be granted to Plaintiffs.  The three main movers (Judge Brantley, Village Attorney DiSalvo, and Special Prosecutor Feinberg) of the Village of Hempstead have collaborated in what is stated in the Plaintiffs complaint. By their misdeeds they have undermined the integrity of the Court system in Hempstead.  On the basis of their long, combined tenure and experience of over 50 years as Village Officials, charged with the responsibility to protect the rights of the community, one can reasonably infer that Plaintiffs' case is not isolated but part of an ongoing criminal practice.

SAC at 30; Pls.' Opp'n. I at 3-4.

Due to the speculative nature of Plaintiffs' assertions and the absence of "facts tending to support, at least circumstantially, an inference that . . . a municipal policy or custom exists," *Santos*, 847 F. Supp. 2d at 576, the Court finds that Plaintiffs' allegations are insufficient to state a claim for municipal liability under Section 1983.  *See Reyes v. Fairfield Properties*, 661 F. Supp. 2d 249, 268 (E.D.N.Y. 2009) ("[C]onclusory assertions [contained in a complaint] are not entitled to the assumption of truth, and factual allegations must plausibly support the reasonable inference that plaintiffs are entitled to relief."); *Sileo v. Principal Life Ins. Co.*, No. 00-CV-1239, 2001 WL 366422, at *2 (N.D.N.Y. Apr. 10, 2001), *aff'd*, 29 Fed. App'x 765 (2d Cir. 2002) ("A pleading which consists of bald assertions and conclusory allegations unsupported by factual assertions 'will not suffice to state a claim.'").  Moreover, as noted in the Court's previous Report and Recommendation, even if individual Village employees violated Plaintiffs' rights, in the absence of a municipal policy or custom, the Village "may not be held liable for these actions simply because they were committed by actors who were its employees."  *Dellutri v. Vill. of*

*Elmsford*, 895 F. Supp. 2d 555, 566 (S.D.N.Y. 2012); *Curry v. City of Syracuse,* 316 F.3d 324,

330 (2d Cir.2003) ("[A] municipality may not be held liable under § 1983 simply for the isolated

unconstitutional acts of its employees.") (internal quotation marks omitted)); *Ricciuti v. N.Y.C.*

*Transit Auth.,* 941 F.2d 119, 122 (2d Cir. 1991) ("A municipality and its supervisory officials

may not be held liable in a § 1983 action for the conduct of a lower-echelon employee solely on

the basis of respondeat superior.").

### 2.    *Failure to State the Elements of the Underlying Claims*

While the SAC fails to implicate municipal liability as to the Village for Plaintiffs'

constitutional claims, these claims must also fail because the SAC does not allege facts sufficient

to plead the underlying causes of action.  As noted, the Court construes the SAC to attempt to

assert the following constitutional claims against the Village:  (1) malicious prosecution; (2)

malicious abuse of process; (3) violations of the right against double jeopardy; (4) violations of

substantive due process; and (5) conspiracy.  Each of these claims must fail, as explained below.

### a.    **Malicious Prosecution and Abuse of Process**

Under the heading of "MALICIOUS PROSECUTION," the SAC posits the following:

> Can there be anything more malicious than to keep individuals under
> Court supervision for over three (3) years to prevent them from
> seeking redress. Prosecution started even though the inspector
> assigned to the case was of the opinion that there was no offense
> committed and when Ms. Ayesha Brantley the judge sitting in our
> case did not recuse herself from the case after having released a fake
> document to harm us, our prosecution became malicious. We were
> constantly harassed by forcing us to sit in a Courtroom for hours,
> each time only to be told that our case has been rescheduled for two
> weeks later - this harassment has been ongoing from 2008-2010 and
> from 2013-2017.
>
> In more than fifty (50) occasions we experienced the feeling of being
> "seized" -not being in control of our time and being imposed on. On
> some level this is worse than incarceration. With incarceration
> comes the knowledge of what offense you are charged with, the

> length of your sentence, etc. Here we are dealing with smart, educated, and dishonest individuals who are willing to commit fraud as a means to monetary gain at the cost of our financial down-fall without compunction.

SAC at 29. Similarly, the first page of the SAC alleges that "the criminal process was misused with no excuse of justification and the notion of probable cause was abused over and over again." *Id*. at 1. From these assertions, the Court construes the SAC to attempt to assert claims for malicious prosecution and abuse of process.[16]

Claims seeking redress for the torts of malicious prosecution and malicious abuse of process are viable under Section 1983. *See Savino v. City of New York*, 331 F.3d 63, 72, 76-77 (2d Cir. 2003) (citing *Cook v. Sheldon*, 41 F.3d 73, 80 (2d Cir. 1994)). Under New York law, "[t]he elements of an action for malicious prosecution are (1) the initiation of a proceeding, (2) its termination favorably to plaintiff, (3) lack of probable cause, and (4) malice."[17] *Savino*, 331 F.3d at 72 (citation omitted). Similarly, "a malicious abuse-of-[criminal] process claim lies against a defendant who (1) employs regularly issued legal process to compel performance or forbearance of some act (2) with intent to do harm without excuse of justification, and (3) in order to obtain a collateral objective that is outside the legitimate ends of the process." *Id*. at 76.

The SAC fails to state a claim for either malicious prosecution or malicious abuse of process. Plaintiffs' malicious prosecution claim must fail because the SAC makes clear that the

---

[16]   In an abundance of caution, the Court construes the SAC to assert a claim for abuse of process notwithstanding the fact that the explicit reference to "Abuse of Process," which appeared on page 4 of the Amended Complaint, no longer appears in the SAC.

[17]   In addition, the Second Circuit has noted that a "plaintiff asserting a Fourth Amendment malicious prosecution claim under § 1983 must . . . show some deprivation of liberty consistent with the concept of seizure." *Singer v. Fulton Cnty. Sheriff,* 63 F.3d 110, 116 (2d Cir. 1995). The Court does not address whether Plaintiffs have sufficiently pleaded "seizure." *See* SAC at 29.

"second round" of prosecutions related to their properties terminated in 2017 *against* Plaintiffs. *See* SAC at 7 ("On January 3, 2017, a decision was handed down by Judge Kaisha Brantley, finding liability for Plaintiffs on two (2) of five (5) charges. Included in her January 3, 2017 decision, is her finding in conjunction with another property (196 Long Beach Road) that was recently reacquired by Plaintiffs. She found liability for Plaintiffs on three (3) of the eight (8) items listed."). To the extent this language is less than clear, the SAC purports to directly quote the January 3, 2017 decision of Justice Brantley, which states as follows:

> The People have met their burden of proof with respect to informations B-444A/13, B-444D/13, B-2339/14, and B-378/15. Whereas the crux of Defendant's arguments is opposition to the violations is that he did not have knowledge of the conditions/or did not have access to the property to cure them, said arguments are unavailing with respect to these violations. The broken glass pane on the front door, missing attic window, missing handrail, and rubbish and litter violations were all conditions that were visible from the street and/or the common spaces in the property and curable by Defendant.

SAC at 25. Because Plaintiffs were found liable for building code violations, their claim for malicious prosecution must fail.

Moreover, to the extent Plaintiffs contend that the "dismissal" of certain charges on January 27, 2010 (following the first "round" of prosecution against them) can sustain their malicious prosecution claim, *see* SAC at 29 (explaining that the alleged malicious prosecution occurred from 2008-10 and from 2013-17), this contention is without merit. Even assuming that the dismissal of these violations by the Village was sufficient to "fairly imply [Plaintiffs'] innocence," *Liberty Synergistics, Inc. v. Microflo Ltd.*, 50 F. Supp. 3d 267, 285 (E.D.N.Y. 2014) ("The favorable termination element must be established by evidence that 'the court passed on the merits of the charge or claim . . . under circumstances as to show . . . nonliability,' or evidence that the action was abandoned under circumstances which 'fairly imply the plaintiff's

innocence.'") (quoting *Castro v. E. End Plastic, Reconstructive & Hand Surgery, P.C.*, 850 N.Y.S.2d 483, 485 (2008)), all instances of alleged malicious prosecution during the initial "round" of prosecutions fall well beyond the relevant statute of limitations. "[T]he applicable statute of limitations for § 1983 actions in New York is three years, and [ ] for claims based in malicious prosecution, this period starts to run only when the underlying criminal action is conclusively terminated." *Murphy v. Lynn*, 53 F.3d 547, 548 (2d Cir. 1995). Assuming, for the sake of argument, that Plaintiffs' initial prosecutions "terminated" in their favor when they were dismissed (or withdrawn) by the Village on January 27, 2010, a viable malicious prospection claim brought pursuant to Section 1983 would have to have been filed by January 27, 2013. The initial Complaint in this action was not filed until May 25, 2017. *See* DE 1. Accordingly, any Section 1983 claim arising from the first round of Plaintiffs' prosecutions by the Village is untimely.

Like Plaintiffs' malicious prosecution claim, Plaintiffs' malicious abuse of criminal process claim must also fail. The SAC fails to plausibly allege the second and third elements of an abuse of process claim, namely, (ii) an intent to do harm without excuse of justification (iii) in order to obtain a collateral objective that is outside the legitimate ends of the process. In the Court's view, it is not plausible that the Village conspired with third-parties to prosecute Plaintiffs' for manufactured violations of the building code "to keep [Plaintiffs] distracted and preoccupied in order to facilitate the complete takeover of [their] property by Mr. Levy, an official in the Treasurer's Office in the Village." SAC at 4-5. These allegations are essentially conjecture. Even if the Court were to accept that individual Village actors possessed an intent or motive to harm Plaintiffs, "it is not sufficient for a plaintiff to allege that the defendants were seeking to retaliate against him by pursuing his arrest and prosecution. Instead, he must claim

that they aimed to achieve a collateral purpose beyond or in addition to his criminal prosecution." *Hoffman v. Town of Southampton*, 893 F. Supp. 2d 438, 448 (E.D.N.Y. 2012), *aff'd sub nom. Peter L. Hoffman, Lotte, LLC v. Town of Southampton*, 523 Fed. App'x 770 (2d Cir. 2013). Here, the SAC contains language that multiple building code violations actually existed at Plaintiffs' properties. This fact undermines the plausibility of a motivation completely collateral to enforcement of the building code. *See id*. at 448 ("Typical scenarios in which courts in this circuit have sustained a claim of malicious abuse of process involve prosecutions for reasons wholly outside of the initial prosecution.") (collecting cases).

### b.      Violations of the Right Against Double Jeopardy

The SAC contains a single reference to "double jeopardy." *See* SAC at 1 ("[A] scheme was hatched to open up a new case and drag it on for years in order to use the statute of limitation as a shield from any fallout from their double jeopardy and malicious prosecution violations."). The Double Jeopardy Clause of the Fifth Amendment "protects against a second prosecution for the same offense after acquittal. It protects against a second prosecution for the same offense after conviction. And it protects against multiple punishments for the same offense." *Ohio v. Johnson*, 467 U.S. 493, 498 (1984) (citation omitted); *United States v. Morgan*, 51 F.3d 1105, 1113 (2d Cir. 1995) ("The Double Jeopardy Clause protects a person from prosecution for the same offense following either an acquittal or a conviction, and it protects also against multiple punishments for the same offense.") (citing *North Carolina v. Pearce,* 395 U.S. 711, 717 (1969)). Importantly, "the [Double Jeopardy] 'Clause protects only against the imposition of multiple *criminal* punishments for the same offense,' and it thus does not extend to civil penalties." *Dubin v. Cty. of Nassau*, No. 16-CV-4209, 2017 WL 4286613, at

*23 (E.D.N.Y. Sept. 27, 2017) (quoting *Hudson v. United States*, 522 U.S. 93, 99 (1997)) (emphasis in original).

The Court concludes, as it did with respect to Plaintiffs' Amended Complaint, that the SAC fails to plead facts which plausibly suggest that Plaintiffs have been convicted or acquitted of charges in the Village Court, and that they have either been prosecuted a second time following any such conviction or acquitted in the Village Court for the same offense, or that they have suffered multiple punishments for the same offense.

### c.    Violations of Substantive Due Process

To the extent the SAC attempts to assert claims for violation of Plaintiffs' substantive due process rights, the Court concludes that such claims must fail.  "Government conduct may be actionable under section 1983 as a substantive due process violation if it 'shocks the conscience.'"  *Spear v. Town of W. Hartford*, 954 F.2d 63, 68 (2d Cir. 1992) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)).  "In order to shock the conscience and trigger a violation of substantive due process, official conduct must be outrageous and egregious under the circumstances; it must be truly brutal and offensive to human dignity." *Lombardi v. Whitman*, 485 F.3d 73, 81 (2d Cir. 2007) (internal quotation marks and alteration omitted); *Velez v. Levy*, 401 F.3d 75, 93-94 (2d Cir. 2005) (noting that actions that shock the conscience occur "largely in the context of excessive force claims," but also unquestionably include other "malicious and sadistic abuses of power by government officials, intended to oppress or to cause injury and designed for no legitimate government purpose") (internal quotation marks omitted); *Schultz v. Inc. Vill. of Bellport*, 08-CV-0930, 2010 WL 3924751, at *6 (E.D.N.Y. Sept. 30, 2010) (noting this standard "is not easily met; the plaintiff must show the government conduct was egregious

and outrageous, not merely incorrect or ill-advised") (quoting *Ferran v. Town of Nassau,* 471

F.3d 363, 369-70 (2d Cir. 2006)) (internal quotation marks omitted).

No additional facts have been asserted in the SAC which would alter the Court's finding

in the previous R&R that Plaintiffs have failed to state a claim for violation of their substantive

due process rights.  Like their Amended Complaint, even when taken as true and read in the light

most favorable to Plaintiffs, Plaintiffs' SAC fails to plausibly allege any conduct that "shocks the

conscience."  As such, to the extent Plaintiffs again attempt to plead a substantive due process

claim, the claim fails.

### d.    Conspiracy

The gravamen of Plaintiffs' lawsuit as presented in the SAC remains that multiple

Village officials conspired with each other, as well as with private actors, to "harass" and

"distract" Plaintiffs with the ultimate goal of dispossessing them of their property.  Under the

heading "CONSPIRACY" in the SAC, Plaintiffs state as follows:

> Plenty of references were made in 2015 and 2016, in our motion to
> dismiss, to the existence of a certified transcript of an imaginary
> Court session. Everyone connected to the Village Attorney's Office
> and the Village Court must have known the illegality of such a fact
> and yet in denying our motion to produce the audio of this imaginary
> Court session the Court stated "Not available." as opposed to, "Does
> not exist." In so stating, the Court in the person Ayesha K. Brantley
> was being deliberately ambiguous confirming her involvement in
> this illicit scheme. Besides, Deputy Clerk Chris Francois-Venant,
> who was the Court go between with Reportique Stenography
> (Stephanie Valder) stated in minimizing her role "Anything in and
> out of the Court is reviewed and approved by the Judge." Being front
> and center in this conspiracy scheme can any ruling made by her in
> conjunction with us be valid?

SAC at 26.  Plaintiffs go on to assert that "[i]nitially, when M.S. Brantley the Village Justice,

created the document referred to as transcript, she was giving cover to the prosecutor (Mr.

Feinberg) that fabricated records to validate our prosecution."  *Id*. at 27.  Plaintiffs contend that

"[t]o protect this cover, the Village Attorney and Ms. Brantley the Village Justice coordinated their activities to keep us tied up in Court. To that end, they colluded with Tiffany Carter, one of our Section 8 tenants for violations to be created." *Id*.

"In order to survive a motion to dismiss on [a] § 1983 conspiracy claim, [a plaintiff] must allege (1) an agreement between a state actor and a private party; (2) to act in concert to inflict an unconstitutional injury; and (3) an overt act done in furtherance of that goal causing damages." *Ciambriello v. Cty. of Nassau*, 292 F.3d 307, 324-25 (2d Cir. 2002) (citing *Pangburn v. Culbertson,* 200 F.3d 65, 72 (2d Cir. 1999)). "In addition, 'complaints containing only conclusory, vague, or general allegations that the defendants have engaged in a conspiracy to deprive the plaintiff of his constitutional rights are properly dismissed; diffuse and expansive allegations are insufficient, unless amplified by specific instances of misconduct.'" *Ciambriello*, 292 F.3d at 325 (quoting *Dwares*, 985 F.2d at 100) (citations, internal quotation marks, and internal alterations omitted). That is, general allegations must be "augmented by 'some details of time and place and the alleged effects of the conspiracy.'" *K.D. ex rel. Duncan v. White Plains Sch. Dist.*, 921 F. Supp. 2d 197, 208 (S.D.N.Y. 2013) (quoting *Romer v. Morgenthau,* 119 F.Supp.2d 346, 363 (S.D.N.Y. 2000)).

Similar to Plaintiffs' allegations of an alleged conspiracy between Village officials and third-parties in its previous Amended Complaint, Plaintiffs' allegations on this subject in the SAC are entirely speculative and conclusory. Significantly, the SAC still fails to allege "details of time and place" with respect to the alleged conspiratorial conduct. *K.D. ex rel. Duncan*, 921

F. Supp. 2d at 208.  For these reasons, Plaintiffs fail to state a claim of conspiracy pursuant to 42 U.S.C. § 1983.[18]

### 3.    Constitutional Claims Against the Village:  Summary

The SAC fails to allege facts sufficient to support a claim for Section 1983 municipal liability against the Village.[19]  The SAC also fails to adequately plead Plaintiffs' underlying constitutional claims – malicious prosecution, malicious abuse of criminal process, violations of the right against double jeopardy, violations of substantive due process, and conspiracy.  For these two independent reasons, the Court respectfully recommends to Judge Bianco that all Section 1983 claims asserted against the Village be dismissed.

### 4.    State Law Claims

The SAC purports to assert a claim for fraud against the Village.  *See* SAC at 27-28.  This claim sounds in state tort law, and a federal court's exercise of jurisdiction over such a claim against a municipality is subject to the notice of claim requirement in the General Municipal Law.  As to this requirement, New York's General Municipal Law provides, in relevant part:

> No action . . . shall be prosecuted or maintained against a . . . village . . . for personal injury . . . alleged to have been sustained by reason

---

[18]    As the Court noted in its initial Report and Recommendation, even if Plaintiffs had sufficiently pleaded a conspiracy claim, such a claim would be barred by the "intra-corporate conspiracy doctrine."  "The intracorporate conspiracy doctrine 'bars conspiracy claims alleging concerted action by employees and/or the heads of various departments within a single municipal entity, at least where the complaint fails to allege that the various [municipal] entities were effectively acting as separate entities in carrying out the alleged conspiracy.'"  *Broich v. Inc. Vill. of Southampton*, 650 F. Supp. 2d 234, 247 (E.D.N.Y. 2009) (quoting *Dunlop v. City of New York,* No. 06 Civ. 0433, 2008 WL 1970002, at *9 (S.D.N.Y. May 6, 2008)).

[19]    Even had Plaintiffs named the Village prosecutor as a defendant, "[i]t is by now well established that 'a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution' 'is immune from a civil suit for damages under § 1983.'"  *Norton v. Town of Brookhaven*, 33 F. Supp. 3d 215, 229 (E.D.N.Y. 2014) (quoting *Shmueli v. City of New York,* 424 F.3d 231, 236 (2d Cir. 2005)), *on reconsideration*, 47 F. Supp. 3d 152 (E.D.N.Y. 2014).

> of negligence or wrongful act of such . . . village . . . or of any officer,
> agent or employee thereof . . . unless . . . a notice of claim shall have
> been made and served upon the . . . village . . . in compliance with
> section fifty-e of [the New York General Municipal Law].

N.Y. GEN. MUN. LAW § 50–i(1).  It is settled law that "[f]ederal courts do not have jurisdiction to

hear state law claims brought by plaintiffs who have failed to comply with the notice of claim

requirement, nor can a federal court grant a plaintiff permission to file a late notice of claim."

*Friel v. Cty. of Nassau*, 947 F. Supp. 2d 239, 247 (E.D.N.Y. 2013) (quoting *Dingle v. City of

New York,* 728 F.Supp.2d 332, 348-49 (S.D.N.Y. 2010)); *In re Dayton*, 786 F. Supp. 2d 809, 823

(S.D.N.Y. 2011) ("New York law 'provides that no tort action shall be prosecuted or maintained

against a municipality or any of its officers, agents, or employees unless: (1) a notice of claim

has been served against the [municipality]; (2) the [municipality] has refused adjustment or

payment of the claim; and (3) the action is commenced within one year and ninety days after the

event upon which the claim is based occurred.'") (quoting *Gibson v. Comm'r of Mental Health*,

No. 04-CV-4350, 2006 WL 1234971, at *5 (S.D.N.Y. May 8, 2006)).

The Village argues, as it did in its motion to dismiss the Amended Complaint, that to the

extent the Court construes the SAC to assert state law claims, such claims must be dismissed

because Plaintiffs have not filed a timely notice of claim.  *See* Village's Mem. at 9-10.

Plaintiffs' singular reference to a "notice of claim" in the SAC is found at page 20 of that

document, where Plaintiffs assert that

> on Friday, March 6, 2015, Kevin Jackson was in front of our
> residence at 11 Oak Avenue, in Hempstead at 10:45 a.m. when
> questioned about his presence there, he responded that snow on the
> walkway was not sufficiently removed which sounded absurd at the
> time to us. From this incident, Plaintiffs realized that it was 2009 all
> over again and their only alternative was to take the Village to Court
> to stop the harassment, to that end, a Notice of Claim was prepared
> and given to the Village Court (Exhibit I).

SAC at 20. "Exhibit I," attached to the SAC, purports to be a letter dated April 21, 2015 from Plaintiff Gerald Jean Baptiste to the Clerk of the Village Court stating, among other things, that he has not received a response to a FOIL request.[20]  *See* SAC at 41.  Plaintiffs' opposition to the Village's motion to dismiss the SAC seems to argue that the notice of claim requirement was satisfied in several ways.  Plaintiffs' opposition references the April 2015 letter to the Clerk of the Village Court, although the argument that Plaintiffs are attempting to make with respect to that letter is less than clear.  *See* Pls.' Opp'n. I at 16-21.  Other attempts in Plaintiffs' opposition memorandum to address the notice of claim requirement include Plaintiffs' reference to a letter to the Village Building Superintendent in January 2009, *see id*. at 23, 57; Plaintiffs' reference to a letter to the Mayor in March 2009, *see id.* at 4, 17-18; Plaintiffs' reference to their correspondence with "Ms. Perez" in the Village Clerk's office in 2018 – after the instant action had been commenced, *see id.* at 17; and Plaintiffs' reference to other correspondence with other Village officials at different times between 2008 and 2017.  *See id.* at 19.

As the Court explained in its initial Report and Recommendation, Plaintiffs misapprehend the strict nature of compliance required by Section 50 of the General Municipal Law.  None of their proffered communications with Village officials constitutes a proper notice of claim under N.Y. GEN. MUN. LAW §§ 50–e and 50–i.  For the statutory notice of claim requirement of Section 50-i(1) to be met, a notice of claim must satisfy the requirements of Section 50-e(2):  it must be in writing, sworn on behalf of the claimant, and, among other things, it must set forth the nature of the claim, the time when, place where, and manner in which the claim arose, and the injuries sustained.  The communications proffered by Plaintiff do not satisfy

---

[20] The initial FOIL request appears to be attached to Plaintiffs' memorandum in opposition to the Village's motion and is dated April 14, 2015.  *See* Pls.' Opp'n. I at 46.

the requirements of Section 50-e(2).  Significantly, the subject of what the SAC refers to as the "notice of claim" – the April 21, 2015 single-page letter to the Clerk of the Village Court – is limited to Plaintiffs' desire to obtain an audio recording of the January 27, 2010 Village Court proceeding.  Moreover, the document is not sworn to by Plaintiffs and nowhere in the document is there any indication that it was intended to satisfy the requirements of N.Y. GEN. MUN. LAW §§ 50e and 50–i.  The other documents and communications Plaintiffs appear to contend satisfy the notice of claim requirement are similarly deficient in their form and content.[21]

Beyond Plaintiffs' failure to plead or support with documentary evidence their contention that they filed a proper notice of claim with the Village, the Village has already submitted an affidavit from the Village Clerk attesting to the fact that no notice of claim was ever served by Plaintiffs on the Village.  *See* DE 22-2 at 2-3.  New York courts have found similar affidavits dispositive of compliance with the General Municipal Law notice of claim requirement.  *See, e.g., Greenberg v. McLaughlin*, 242 A.D.2d 603, 603 (2d Dep't 1997) ("The Village established its entitlement to summary judgment by submitting the affidavits of the Village Clerk and the Superintendent of Highways indicating that the Village had never received prior written notice of the alleged defective sidewalk."); *Goldberg v. Town of Hempstead*, 156 A.D.2d 639, 640 (2d Dep't 1989) ("[W]e conclude that the affidavit of a town official charged with the duty of overseeing that town's park and recreational facilities indicating that he has caused a search of the town's records and that the search revealed no prior written notice of the defective or dangerous condition alleged to exist at such a facility is sufficient to establish that no such prior written notice was filed with the town.").

---

[21]    In addition to being deficient in form and content, the letters dated 2009 are untimely under any applicable statute of limitation even if construed to be a notice of claim.

Lastly, as the Court explained in its initial Report and Recommendation, to the extent courts have recognized anything akin to a doctrine of "constructive notice" in the context of Section 50–e – for which Plaintiffs implicitly appear to be advocating – the doctrine "has been used to justify granting an application to serve a late notice of claim, not to obviate serving such a notice." *Oshinsky v. New York City Hous. Auth.*, No. 98 CIV 5467, 2000 WL 218395, at *14 n.5 (S.D.N.Y. Feb. 23, 2000) (citations omitted); *see Hilow v. Rome City School District,* No. 91-CV-567, 1994 WL 328625, *8 (N.D.N.Y. June 29, 1994) (rejecting plaintiff's assertion of "constructive notice" as a substitute for serving a notice of claim, and noting that "the court's independent research [failed to] uncover any authority" supporting constructive notice). As such, the Court declines to apply any such doctrine to abrogate New York's otherwise strict notice of claim requirement.

Because Plaintiffs have not filed a compliant notice of claim with the Village, this Court respectfully recommends to Judge Bianco that any state tort law claim brought against the Village in the SAC be dismissed.

### B.    Claims Against Valder

The SAC's allegations relating to Individual Defendant Stephanie Valder appear primarily on pages 33-35 of that document.  There, Plaintiffs allege as follows:

> Stephanie Valder – when the $250 fee was sent for the transcript of January 27, 2010 to Reportique Stenography, we were extremely curious to see what they would be sending us.
>
> She accomplished what perhaps has never been done before – certifying a transcript of a Court session that never took place.  In doing so, she knowingly participated in a scheme to cover up a crime and create liability for Plaintiffs, aside from violating her oath.

SAC at 33.  Plaintiffs go on to allege that they were not in the Village Courtroom on January 27, 2018,[22] and because of this, "an audio recording or CD [of any proceeding] cannot exist."  *Id*. They also speculate as to why Valder may have fraudulently certified a transcript, and posit that "she has an on-going relationship with the Justice Court . . . . [O]ne can infer that from the outset she knew she was doing a favor to the Justice Court who has helped with work before to the detriment of a defendant she does not know."  *Id*. at 35.

Like their previous pleading, Plaintiffs' SAC does not explicitly state what causes of action they are attempting to assert against Valder.  Valder's motion to dismiss argues that Plaintiffs fail to state a claim for either conspiracy or fraud.  *See generally* Valder's Mem.  The Court finds that to the extent the SAC attempts to plead any claims against Valder, it is reasonable to construe them to be conspiracy and fraud.  The Court finds that the SAC fails to adequately state a claim for either one.

### 1.    *Conspiracy*

Generally speaking, private actors are not proper defendants in Section 1983 actions. *Am. Mfrs. Mut. Ins. Co. v. Sullivan*, 526 U.S. 40, 50 (1999) ("[T]he under-color-of-state-law element of § 1983 excludes from its reach merely private conduct, no matter how discriminatory or wrongful.") (internal quotations omitted).  However, in limited circumstances, a cause of action under Section 1983 may lie against an individual who is sufficiently implicated in state action.  *See Jae Soog Lee v. Law Office of Kim & Bae, PC*, 530 Fed. App'x 9, 9-10 (2d Cir.

---

[22]   The Court does not consider the purported phone records Plaintiffs attempt to submit to show that they were not in Court on January 27, 2010.  *See* SAC at 60.  As Valder correctly points out, even if the Court were to consider these records, they "are meaningless to support any theory that Valder did anything improper," and "common sense dictates that one of the Plaintiffs (Mr. Baptiste) could have been on the phone in Hempstead, New York (as indicated in the phone record) while Ms. Homere, who is the one speaking throughout the transcript, was in the courtroom in Hempstead on January 27, 2010."  Valder's Reply at 2.

2013); *Ciambriello*, 292 F.3d at 324-25.  "To state a claim against a private entity on a section 1983 conspiracy theory, the complaint must allege facts demonstrating that the private entity acted in concert with the state actor to commit an unconstitutional act."  *Spear,* 954 F.2d at 68.  That is to say, "a private actor acts under color of state law when the private actor 'is a willful participant in joint activity with the State or its agents.'"  *Ciambriello*, 292 F.3d at 324 (quoting *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 152 (1970).  Significantly, mere conclusory allegations that a private entity acted in concert with a state actor does not suffice to state a Section 1983 claim against the private entity.  *Ciambriello*, 292 F.3d at 324 (citing *Spear,* 954 F.2d at 68).

Just as Plaintiffs' Amended Complaint failed to state a claim for conspiracy under Section 1983, the SAC similarly fails to state such a claim.  The SAC fails to allege specific facts demonstrating that an improper relationship existed between any Village official and Valder, let alone one that was formed with the intent to harm Plaintiffs.  The Court has attempted to interpret exactly what Plaintiffs are asserting with respect to "Court # sequence on the transcript," SAC at 34-35, and similar allegations.  It appears that Plaintiffs have latched on to certain identifying information on the transcript and/or the paperwork requesting the transcript, as well as to what they see as chronological inconsistencies in the subject matter of the transcript – such as when they were planning a trip to Haiti – as well as when certain fees were paid, to support their theory of a falsified transcript and a related "cover-up."  These few assertions, to the extent the Court is able to understand them, are inherently conclusory and speculative.  As such, Plaintiffs' unsupported conclusions of a nefarious scheme between Valder and the Village Court do not state a claim for conspiracy.

In the end, the allegations in the SAC are insufficient to show that (1) Valder acted in concert with any Village official (2) to commit an unconstitutional act. *Cf. Hughes v. Patrolmen's Benevolent Ass'n of the City of N.Y., Inc.,* 850 F.2d 876, 880-81 (2d Cir.1988) (determining that a complaint alleged sufficient facts to support a conclusion that private-actor PBA had acted under color of state law, where complaint alleged that PBA had hired private investigators and placed plaintiff under surveillance with knowledge and consent of state-actor New York City Police Department). To the extent the Amended Complaint attempts to raise a Section 1983 conspiracy claim against Valder, the Court respectfully recommends to Judge Bianco that the claim be dismissed.

Additionally, the Court notes that to the extent Plaintiffs are attempting to plead a general civil conspiracy claim under New York law, such a claim must also fail. "The elements of a civil conspiracy are (1) an agreement between two or more persons, (2) an overt act, (3) intentional participation in the furtherance of a plan or purpose and (4) resulting damage." *Fagan v. First Sec. Investments, Inc.*, No. 04 CIV. 1021, 2006 WL 2671044, at *4 (S.D.N.Y. Sept. 15, 2006) (quoting *Official Committee of Unsecured Creditors v. Donaldson, Lufkin & Jenrette Sec. Corp.,* No. 00 Civ. 8688, 2002 WL 362794, at *13 (S.D.N.Y. Mar. 6, 2002)). "[U]nder New York Law, the substantive [or independent] tort of civil conspiracy . . . is available only if there is evidence of an underlying actionable tort, which was the object of the conspiracy." *Rusyniak v. Gensini*, 629 F. Supp. 2d 203, 226 (N.D.N.Y. 2009) (internal quotation marks omitted). The only potential underlying tort the Court can identify here is fraud. However, as explained below, and for essentially the same reasons Plaintiffs' other claims fail, the SAC fails to state a claim for common law fraud. Any claim for civil conspiracy must fail as a result.

### 2.    *Fraud*

In New York, to state a claim for common law fraud, a plaintiff must allege "a material, false representation, an intent to defraud thereby, and reasonable reliance on the representation, causing damage to the plaintiff." *May Dep't Stores Co. v. Int'l Leasing Corp.*, 1 F.3d 138, 141 (2d Cir. 1993). It is well settled that in order to adequately plead a claim of fraud, a plaintiff must satisfy a heightened pleading standard as set forth in Federal Rule of Civil Procedure 9(b). Specifically, "a party must state with particularity the circumstances constituting fraud or mistake." FED. R. CIV. P. 9(b); *see Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006) ("[T]he elements of a breach of fiduciary duty based in fraud must be plead with particularity.").

In the SAC, Plaintiffs have failed to allege facts sufficient to plausibly state the elements of common law fraud. As with the Amended Complaint, the SAC is devoid of anything other than conclusory assertions that because Plaintiffs – according to their own account of events – were not in the Village Court on January 27, 2010, Valder falsified a court transcript and "lied" "[b]ased on the fact that she has an on-going relationship with the [ ] Court." SAC at 35. Although Plaintiffs appear to attempt to satisfy the intent element of a fraud claim on page 35 of the SAC under a bolded heading, "Why did she lie?," their assertions are again inherently conclusory and speculative. Moreover, the Court does not find anything in the SAC with regard to Plaintiffs' reliance on Valder's alleged false representation. Consequently, the Court respectfully recommends to Judge Bianco that any fraud claim the SAC attempts to assert be dismissed.

### C.    Defendant Levy

Plaintiffs' revised Second Amended Complaint, which was filed on May 18, 2018, and

which this Court, in its discretion, has accepted differs from the SAC filed on May 17, 2018 only

in its addition of "Mr. Levy" as a defendant in the caption.  The SAC references Mr. Levy only a

handful of times beyond the caption.  Plaintiffs allege that Mr. Levy, "an official in the

Treasurer's Office in the Village" was the main facilitator behind the attempt to take Plaintiffs'

property.  SAC at 4-5.  They also state that Mr. Levy was successful in taking their property:

"Indeed when Mr. Levy informed us in 2010 that our property at 196 Long Beach Road does

now belong to him, it was a complete surprise and a total shock."  *Id*. at 5.  Similarly, Plaintiffs

state:  "the tax records indicate that in 2008, while we were being prosecuted and persecuted as

the owners of the premises, Mr. Levy was the owner of record of that property," *id*., and "[a]

prosecution that started as a smokescreen to provide Mr. Levy with the latitude to distract us

while taking over our property was restarted four years later in the same court with the same

charges. This is astonishing!" *Id*.  Plaintiffs go on to assert that Mr. Levy "[m]anipulat[ed] and

alter[ed] tax records in order to convert $2,710.00 into a $434,500.00 windfall." *Id*. at 28.

The SAC fails to state a claim against Mr. Levy.  For the reasons discussed above,

Plaintiffs are unable to bring a claim against Mr. Levy in his official capacity because they have

failed to plead a claim for municipal liability under Section 1983, the two being identical as a

practical matter.  As for any claim against Mr. Levy in his individual capacity, the allegations

against him are of the same conclusory and speculative nature which generally comprise the

SAC.  In the Court's view, even if it were able to determine the exact nature of the claims against

Mr. Levy, the underlying factual allegations are simply too conclusory and lack a basic modicum

of plausibility.[23]   As such, the Court respectfully recommends to Judge Bianco that any claims purportedly asserted against "Mr. Levy" be dismissed.

### D.   Plaintiffs' Motion to Amend

On November 16, 2018, several weeks after the motions to dismiss were referred to this Court, Plaintiffs filed a letter motion requesting that they be allowed to amend their pleadings "to add another party, Jeffery Falk as a defendant in the caption." Pls.' MTA.  Judge Bianco has referred Plaintiffs' motion to amend the SAC to the undersigned for a Report and Recommendation as to whether the motion should be granted.  *See* DE 56.  For the reasons set forth below, this Court respectfully recommends to Judge Bianco that Plaintiffs' motion to amend the SAC to add an additional party be denied.

Whether to grant leave to amend is a decision squarely within the district court's discretion.  *Krupski v. Costa Crociere S. p. A.*, 560 U.S. 538, 540 (2010) ("[Rule 15(a)] gives a district court discretion to decide whether to grant a motion to amend a pleading before trial."); *MHANY Mgmt. v. Cty. of Nassau*, 843 F. Supp. 2d 287, 340 (E.D.N.Y. 2012) (noting that "it is ultimately within the sound discretion of the court whether to grant leave to amend").  A court "should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2); *Iqbal v. Ashcroft*, 574 F.3d 820, 822 (2d Cir. 2009) (quoting Fed. R. Civ. P. 15(a)(2)); *Grace v. Rosenstock*, 228 F.3d 40, 56 (2d Cir. 2000) (same); *Guideone Specialty Mut. Ins. Co. v. Hapletah*, No. 05 Civ.

---

[23]   Additionally, it is possible that Levy would be entitled to the protections of qualified immunity.  "Qualified immunity shields government officials performing discretionary functions 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 702 (S.D.N.Y. 2011) (quoting *Zellner v. Summerlin*, 494 F.3d 344, 367 (2d Cir. 2007)).  However, the lack of basic factual context in the SAC with respect to Levy prevents the Court from determining whether Levy he is entitled to the protections of qualified immunity.

1401, 2006 WL 1455468, at *1 (E.D.N.Y. May 24, 2004) ("[Rule 15(a)] provides for a liberal amendment of pleadings.").

Notwithstanding this liberal standard, "[o]ne appropriate basis for denying leave to amend is that the proposed amendment is futile." *Lucente v. Int'l Bus. Machines Corp.*, 310 F.3d 243, 258 (2d Cir. 2002); *Ruffolo v. Oppenheimer & Co.,* 987 F.2d 129, 131 (2d Cir. 1993) ("Where it appears that granting leave to amend is unlikely to be productive . . . it is not an abuse of discretion to deny leave to amend."). "An amendment to a pleading is futile if the proposed claim could not withstand a motion to dismiss pursuant to Fed.R.Civ.P. 12(b)(6)." *Ferrara v. Smithtown Trucking Co.*, 29 F. Supp. 3d 274, 279 (E.D.N.Y. 2014); *Dougherty v. Town of N. Hempstead Bd. of Zoning Appeals*, 282 F.3d 83, 88 (2d Cir. 2002).

Here, Plaintiffs seek leave to amend their complaint a fourth time "to add another party, Jeffery Falk as a defendant in the caption." Pls.' MTA. The motion states as follows:

> In the aftermath of our son's near-fatal accident on January 17, 2013, Plaintiff's retained Jeffrey Falk as our attorney to promote and protect our son's interests.
>
> Plaintiffs became acquainted with Jeffrey Falk in 2010 when he handled Plaintiffs repurchasing of their property at 196 Long Beach Road from Mr. Levy.
>
> In November of 2013, when the Village of Hempstead restarted prosecution of Summonses they had dismissed on January 27, 2010, against Plaintiffs, Mr. Falk was approached by Plaintiffs to handle the matter. Mr. Falk held the file for about three (3) weeks then informed Plaintiffs of not being interested. Plaintiffs were taken back especially after trusting Mr. Falk with making decisions on the welfare of their son. ·
>
> The prosecution of Plaintiffs in 2013, has always been a sticking aspect for Plaintiffs to get their mind around because it appeared illogical since they could have issued new summons to accomplish the same results. On page 5, lines 13-15 of Second Amended Complaint, Plaintiffs have stated "A prosecution that started as a smoke screen to provide Mr. Levy with the latitude to distract us

while taking over the property was restarted four (4) years later in the same Court with the same charges. This is astonishing!"

However, based on what Plaintiffs learned recently, the timing of this prosecution was logical. It was done to allow Mr. Falk to have some leverage in closing our son's case. Mr. Falk had floated the idea of closing the case by May of 2014 with our son receiving approximately $10,000.00.

In June of 2014, Mr. Falk misrepresented Plaintiffs at a hearing at the Department of Social Services (DSS) for Plaintiffs to be liable for a substantial amount of money for blacktop in the driveway and a stair lift that Plaintiffs have to incur in order to accommodate their son's coming home from St. Johnland Rehabilitation Center every Sunday.

Plaintiffs have included (Exhibit A) documents submitted by Plaintiffs in The Order to Show Cause.

Mr. Falk's Affirmation In Opposition as (Exhibit B), Plaintiffs Reply to Affirmation In Opposition (exhibit C).

The full story in this saga cannot be told unless Mr. Falk's actions are exposed.

Pls.' MTA.

Plaintiffs' proposed amendment is futile for two primary reasons. First, for the many reasons expressed in this Report and Recommendation and similarly expressed in the Court's previous Report and Recommendation, Plaintiffs' allegations against both the Village and Valder have been, in every iteration of the pleadings submitted by Plaintiffs, fatally speculative and conclusory. The SAC's myriad pleading deficiencies would not be cured by simply adding "Jeffrey Falk" as a defendant. Indeed, it does not appear that any allegations relating to Jeffrey Falk have been made in the SAC.

The absence of any allegations relating to Jeffrey Falk in the SAC is illustrative of the second reason why any attempted amendment relating to Jeffrey Falk would be futile. It appears highly unlikely that any substantive allegations as to Jeffrey Falk which Plaintiffs attempt to add

to their pleading are material to Plaintiffs' lawsuit against the Village and Valder.  The contents of Plaintiffs' letter motion to amend demonstrates that there is little to no connection between Jeffrey Falk and Plaintiffs' prosecutions by the Village.  If there were such a connection, it seems likely that some mention of Mr. Falk would have been made in Plaintiffs' prior complaints. Rather, Plaintiffs' grievance against Jeffrey Falk appears to stem from Falk's alleged "misrepresent[ation] [of] Plaintiffs at a hearing at the Department of Social Services" related to home improvements for their son's return from rehabilitation.  Pls.' MTA.  Although Plaintiffs claim that the timing of their second round of prosecution by the Village was "logical" because "[it] was done to allow Mr. Falk to have some leverage in closing our son's case," such an allegation, to the extent the Court is able to understand it, is as speculative and conclusory as Plaintiffs' other allegations relating to a multi-pronged scheme to harass and prosecute them.

The Court remains cognizant of Plaintiffs' *pro se* status, as well as the opportunity provided by the Court to *pro se* litigants to flesh out their claims by way of amendment.  *See Thompson v. Carter,* 284 F.3d 411, 419 (2d Cir. 2002).  However, in the instant matter, Plaintiffs have been afforded ample opportunity to plead their claims.  The SAC as pleaded remains fatally deficient. Any amendment to add to the SAC either Mr. Falk as a party, substantive allegations relating to Mr. Falk, or both, would not cure the SAC's deficiencies.  Accordingly, this Court respectfully recommends to Judge Bianco that Plaintiffs' motion to amend the SAC be DENIED.

## V.    CONCLUSION

For the foregoing reasons, the Court respectfully recommends to Judge Bianco that the motions to dismiss brought by the Defendants the Village of Hempstead and Stephanie Valder be GRANTED, and the Second Amended Complaint be DISMISSED, with prejudice.  The Court

further recommends that Plaintiffs' motion to amend the Second Amended Complaint be DENIED.

**VI.    OBJECTIONS**

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 72 of the Federal Rules of Civil Procedure, the parties shall have fourteen (14) days from service of this Report and Recommendation to file written objections.  *See also* FED. R. CIV. P. 6(a), (e).  Such objections by an attorney of record shall be filed with the Clerk of the Court via ECF.  Pro Se litigants who wish to file objections must mail those objections directly to the Chambers of Judge Bianco.  **A courtesy copy of any objections filed is to be sent to the Chambers of Judge Joseph F. Bianco.  Any requests for an extension of time for filing objections must be directed to Judge Bianco prior to the expiration of the fourteen (14) day period for filing objections**.  Failure to file objections will result in a waiver of those objections for purposes of appeal. *Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Beverly v. Walker*, 118 F.3d 900, 901 (2d Cir. 1997), *cert. denied*, 522 U.S. 883 (1997); *Savoie v. Merchants Bank*, 84 F.3d 52, 60 (2d Cir. 1996).

**Counsel for the Village of Hempstead is directed to serve a copy of this Report and Recommendation on the Pro se Plaintiffs forthwith by overnight mail and first-class mail and to file proof of such service on ECF by March 8, 2019.**

|  | **SO ORDERED**. |
|---|---|
| Dated: Central Islip, New York | |
| March 4, 2019 | |
|  | /s/ A. Kathleen Tomlinson |
|  | A. KATHLEEN TOMLINSON |
|  | U.S. Magistrate Judge |